UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: KIRKLAND LAKE GOLD LTD.
SECURITIES LITIGATION

20-CV-4953 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Stephen Brahms, individually and on behalf of all others similarly situated, brings this suit against Kirkland Lake Gold Ltd., a Canadian company that mines and processes gold, Kirkland's CEO, and the former chairman of Kirkland's board of directors (together, "Defendants" or "Kirkland"), for violations of Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated under the Exchange Act, 17 C.F.R. § 240.10b-5. Plaintiff has moved for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3), as well as to exclude the testimony and report of one of Defendants' proposed experts. For the reasons that follow, Plaintiff's amended class certification and *Daubert* motions are denied.

I.      **Background**

The Court assumes familiarity with the factual and procedural history, as set forth in its September 2021 Opinion and Order. *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20-CV-4953, 2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021) (ECF No. 36). As relevant here, the Court granted Defendants' motion to dismiss with respect to all claims except those based on Kirkland CEO Anthony Makuch's statements about acquisitions. *Id.* at *6 (ECF No. 26 at 14). Plaintiff filed a motion for class certification on January 31, 2023 (ECF No. 66) and an amended class certification motion on March 6, 2023 (ECF No. 76). On March 30, 2023, Defendants filed their opposition. (ECF No. 88; ECF No. 89.) Plaintiff filed a reply memorandum on May 22, 2023.

1

(ECF No. 104; ECF No. 105.)  The same day, Plaintiff also filed a motion to exclude the testimony and report of defense expert James Griffin.  (ECF No. 108.)  On June 5, 2023, Defendants filed their opposition to Plaintiff's *Daubert* motion (ECF No. 115; ECF No. 116), and Plaintiff filed his reply memorandum on June 12, 2023 (ECF No. 121; ECF No. 122).  On October 5, 2023, the Court held oral argument on the amended motion for class certification and the *Daubert* motion.  (ECF No. 146.)

## II.     Motion to Exclude

The Court first addresses Plaintiff's motion to exclude the testimony and expert report of James Griffin.  Plaintiff seeks to exclude Griffin's testimony and report on the grounds that Griffin is unqualified and that his testimony is irrelevant and unreliable.  (ECF No. 109 at 6-15.)

### A.     Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that an expert who is "qualified . . . by knowledge, skill, experience, training, or education may testify" if the testimony would be helpful to the trier of fact, is "based on sufficient facts or data," and is "the product of reliable principles and methods," reliably applied to the facts of the case.  Fed. R. Evid. 702.  And these factors, in turn, largely have their origins in *Daubert*, in which the Supreme Court held that the district court bears a critical gatekeeping function in assessing the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-95 (1993).  "The district court has broad discretion to carry out [its] gatekeeping function.  Its inquiry is necessarily a 'flexible one,' and the types of factors that are appropriate to consider will 'depend[] upon the particular circumstances of the particular case at issue.'"  *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (first quoting *Daubert*, 509 U.S. at 594, and then quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  The Second Circuit has "distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact." *In re LIBOR-Based Fin. Instruments Antitrust Litig*., 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018); *see Nimely v. City of New York,* 414 F.3d 381, 396-97 (2d Cir. 2005).

Although "[t]he Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage," it has "offered limited dicta suggesting that a *Daubert* analysis may be required at least in some circumstances." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013); *see also Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393 (S.D.N.Y. 2018) ("[T]he Second Circuit has not resolved whether and to what extent *Daubert* applies at the class certification stage."); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 28-29 (S.D.N.Y. 2020). "[C]ourts in the Second Circuit regularly 'subject expert testimony to *Daubert'*s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis.'" *Bowling v. Johnson & Johnson*, No. 17-CV-3982, 2019 WL 1760162, at *7 (S.D.N.Y. Apr. 22, 2019) (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016)).

Accordingly, the Court here applies a *Daubert* analysis to the extent that Plaintiff seeks to exclude testimony relevant to the pending class certification motion.  However, "the 'scope of the *Daubert* analysis is cabined by its purpose at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23.'" *Bowling*, 2019

3

WL 1760162, at *7 (quoting *Chen-Oster v. Goldman Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015)); *see In re LIBOR*, 299 F. Supp. 3d at 471 ("The question is not whether a jury at trial should be permitted to rely on the expert's report to find facts as to liability, but rather whether the Court may utilize it in deciding whether the requisites of Rule 23 have been met." (quoting *Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086, 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013))); *cf. In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker.").

Defendants offer James Griffin as "a mining industry expert" to opine on "whether Defendants have shown a lack of price impact for the alleged misstatements at the heart of the case." (ECF No. 115 at 6.) Specifically, Griffin offers three expert opinions. First, Griffin opines that because "[m]ining is a self-depleting business model," both organic growth and mergers and acquisitions (M&A) are "complementary" and irreplaceable strategies for "a company's growth potential." (ECF No. 91-1 ¶ 17(a).) Industry observers and practitioners, therefore, would expect gold mining companies to be "generally on the lookout for M&A opportunities as they arise." (*Id.*) Second, Griffin offers the opinion that if the financial market understood Makuch's January 25 and February 22, 2019 statements "to mean that Kirkland would no longer consider any potential M&A opportunities, [he] would not have expected a positive price impact on Kirkland's stock price as a result of these statements." (*Id.* ¶ 17(b).) Third, Griffin opines that if the market understood Makuch's January 14, 2019 statement "to reflect that Kirkland had set certain minimum standards that must be met for Kirkland to

consider a potential acquisition, based on [his] experience and expertise, [he] would not have expected a positive impact on Kirkland's stock price as a result of this statement." (*Id*. ¶ 17(c).)

Plaintiff moves to exclude Griffin's expert report on the grounds (1) that Griffin is not qualified to render an expert opinion, (2) that Griffin's testimony is irrelevant, and (3) that Griffin's opinions are unreliable. (ECF No. 109 at 6-15.) In his filings, Plaintiff focuses his attacks on the second and third of Griffin's opinions. Because Plaintiff offers the same arguments to justify the exclusion of both opinions, the Court addresses the admissibility of Griffin's opinions together rather than separately.

## B. Discussion

### 1. Qualifications

The Court begins with the first step of the Rule 702 inquiry: whether Griffin is qualified as an expert. To answer this question, the Court must first "examine the totality of the witness's background to determine whether he or she exhibits any one or more of the qualifications listed in Rule 702—knowledge, skill, experience, training, or education—with respect to a relevant field." *Washington v. Kellwood Co*., 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). "[A]ny one of these five forms of qualifications will satisfy the rule." *Tiffany (NJ) Inc. v. eBay, Inc.,* 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007). "[A] lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." *In re Rezulin Prod. Liab. Litig.,* 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004). Second, courts must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004), and ensure that the expert will actually be testifying "on issues or subject matter within his or her area of expertise," *Haimdas v. Haimdas,* No. 09-CV-2034, 2010 WL

652823, at *2 (E.D.N.Y. Feb. 22, 2010) (citing *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 80 (2d Cir. 1997)).

Defendants offer Griffin as a mining industry expert based on his degree in mining engineering and his over 40 years of experience in the mining industry, including executive and consultancy roles.  He has also worked over 25 years as an investment banker, advising gold and other mining companies on M&A.  Plaintiff attacks Griffin's qualifications by arguing that his experience is primarily in coal mining and that he lacks experience specifically in gold mining. Plaintiff further argues that Griffin also lacks the expertise to opine on stock price movements, comparing him unfavorably to Plaintiff's own economics expert, Dr. Steven Feinstein, who holds a Ph.D. in economics and works on issues of market efficiency and price impact.

Based on the totality of his background, the Court determines that Griffin is qualified as a mining industry expert.  Griffin is not being offered as an economics expert, and Defendants have offered a separate economics expert to rebut Feinstein's report.  Instead, Defendants offer Griffin to opine on how gold mining industry observers and participants would have interpreted Makuch's statements.  Plaintiff's critique also understates Griffin's gold mining experience: Griffin has worked on M&A issues related to gold and has worked for gold mining clients.  The observation that Griffin's experience has been focused on the coal mining industry, and not primarily on the gold industry, goes, at most, to the weight rather than admissibility of his testimony.  The Court, therefore, concludes that Griffin is qualified based on the totality of his education, knowledge, and experience.

The Court also determines that Griffin's background qualifies him to opine on how financial markets would have interpreted Makuch's statements.  Griffin is not offering a quantitative analysis of price impact or stock price movements, which is covered by the parties'

dueling economics experts.  Instead, relying on his industry experience, Griffin opines on how investors would have broadly reacted to Kirkland's statements.  Griffin's decades of experience working on M&A related to mining, including gold mining, sufficiently qualify him to testify as an expert on how the reaction of industry observers, analysts, and investors to Kirkland's statements would have broadly affected the stock price.  The Court understands the scope of Griffin's expertise and would be capable of weighing his opinions accordingly for the purposes of the class certification motion.

### 2.    Reliability

The Court now turns to the second step of the Rule 702 inquiry: whether Griffin's report has a sufficiently reliable foundation.  "In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'"
*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702).  In *Daubert*, the Supreme Court set forth a list of non-exclusive factors for courts to apply to the reliability inquiry:

> (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Amorgianos*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593-594) (internal citations and quotation marks omitted).  These factors, however, "do *not* constitute a definitive checklist." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999).  Rather, "the trial judge must have

considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

Plaintiff argues that Griffin's opinions are not reliable because they are merely statements of subjective belief and speculation, without any objective standards or supporting data. Plaintiff further contends that Griffin did not reliably apply his methodology to the case and that his opinions are based on only generalities about the mining industry as a whole rather than an assessment of the facts of the case. These arguments are unavailing.

First, Plaintiff appears to be applying reliability requirements for scientific or technical testimony rather than experiential testimony, which is subject a less rigid standard. *See, e.g., Gabel v. Richard Spears Kibbe & Orbe, LLP*, No. 07-CV-11031, 2009 WL 1856631, at *4 (S.D.N.Y. June 26, 2009) (observing that "testimony from the realm of a person's professional experience . . . does not readily lend itself to the *Daubert* framework does not render it inadmissible"). "Where, as here, an expert's opinion is based on the expert's experience, courts focus on the relationship between the experience and the opinion and whether the latter is rationally related to the former." *Mahoney v. JJ Weiser & Co*., No. 04-CV-2592, 2007 WL 3143710, at *5 (S.D.N.Y. Oct. 25, 2007). In this case, the Court determines that there is a rational relationship between Griffin's decades of mining industry experience and his opinions, which concern industry custom, practices, and perceptions.

Second, contrary to Plaintiff's argument that Griffin's conclusions are purely speculative and subjective, Griffin has set forth a logical chain of reasoning that supports his opinions. Griffin opines that industry practitioners and observers have expectations that a gold mining company would pursue M&A opportunities because of the "self-depleting business model" of the industry. (ECF No. 91-1 ¶ 17(a).) Griffin's second and third opinions are logical

conclusions from this starting premise and Griffin's understanding of how investors would react when their expectations are frustrated. (*See id.* ¶¶ 17(a)-(b).) The Court understands that Griffin's opinions are based upon his practical experience working on M&A issues in the industry, and not a data-driven financial model, and would be capable of weighing his opinions accordingly. Finally, Griffin's opinions are sufficiently grounded in the facts of the case— specifically, an analysis of Kirkland's business strategy and historic reliance on M&A for growth. (*See id.* ¶¶ 56-61, 69.) Accordingly, the Court concludes that Griffin's opinions have a sufficiently reliable foundation under Rule 702.

### 3.    Relevance and Assistance to the Trier of Fact

The Court now addresses the final step of the Rule 702 inquiry: whether the expert testimony will assist the trier of fact. This inquiry "goes primarily to relevance." *Daubert*, 509 U.S. at 591. The Second Circuit has instructed "trial court[s] [to] look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant." *Amorgianos*, 303 F.3d at 265. Federal Rule of Evidence 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Plaintiff argues that Griffin's opinions are irrelevant because Griffin did not perform an event study or other quantitative analysis of Kirkland's share price movements. Plaintiff thus contends that Griffin's opinions do not make the fact at issue—whether Makuch's statements affected the stock price—more or less likely. Once again, Plaintiff's arguments go to weight rather than admissibility. As already discussed above, Defendants offer Griffin as a mining industry expert, not an economics expert. The relevance of Griffin's experience-based report is two-fold. First, Griffin's opinions would assist the Court's understanding of how Makuch's statements fit into the customary practices of the mining industry. Second, the opinions would

aid the Court in understanding how financial markets would have practically interpreted and reacted to the statements at issue. Accordingly, the Court concludes that Griffin's opinions are relevant to the evaluation of Plaintiff's price impact theory.

Because all of Plaintiff's objections to Griffin's expert report at most go to weight and not admissibility, the motion to exclude is denied.

## III. Motion for Class Certification

### A. Legal Standard

To obtain certification of a class pursuant to Rule 23(b)(3), a plaintiff must satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a). Fed. R. Civ. P. 23(a). A plaintiff must also meet two additional showings: "predominance, *i.e.*, law or fact questions common to the class predominate over questions affecting individual members, and superiority, *i.e.*, class action is superior to other methods." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006) (citing Fed. R. Civ. P. 23(b)(3)). The party seeking class certification must "affirmatively demonstrate" compliance with each of those requirements "through evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal citation and quotation marks omitted).

### B. Discussion

To certify a class, the Court must conduct a "rigorous analysis" to determine that Rule 23's requirements have been satisfied. *Comcast Corp.*, 569 U.S. at 33 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). Here, that includes Rule 23(b)(3)'s requirement of predominance, which "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

The Court's analysis begins and ends with the issue of predominance. "Because the Court concludes that Plaintiffs have not adequately demonstrated predominance, it need not

address the other [Rule 23] requirements." *Hunter v. Time Warner Cable Inc.*, No. 15-CV-6445, 2019 WL 3812063, at *9 (S.D.N.Y. Aug. 14, 2019).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action," which in a private securities-fraud claim includes "reliance upon the misrepresentation or omission." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011). In *Basic v. Levinson*, 485 U.S. 224 (1988), the Supreme Court recognized that plaintiffs in securities fraud class actions can establish a class-wide presumption that investors relied on any misrepresentations reflected in a security's market price. As the Second Circuit recently summarized in *Arkansas Teachers Retirement System v. Goldman Sachs Group, Inc. (ATRS),* 77 F.4th 74 (2d Cir. 2023):

> The *Basic* presumption excuses classes of securities fraud plaintiffs from proving that each class member individually relied upon a defendant's alleged misrepresentations. Courts can instead presume that stock trading in an efficient market incorporates into its price all public, material information—including material misrepresentations—and that investors rely on the integrity of the market price when they choose to buy or sell that stock.

*Id*. at 80.

The *Basic* presumption of class-wide reliance is rebuttable. "[D]efendants can rebut the presumption and defeat class certification by demonstrating, by a preponderance of the evidence, that the misrepresentations did not actually affect, or impact, the market price of the stock." *Id*. Therefore, while a plaintiff's "satisfaction of *Basic*'s prerequisites serves as an 'indirect proxy' for a showing of price impact," *id*. at 86 (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278-81 (2014)), "an indirect proxy should not preclude . . . a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply," *Halliburton*, 573 U.S. at 281-82. Here, Defendants do not dispute Plaintiff's satisfaction of *Basic*'s prerequisites

and instead seek to rebut the *Basic* presumption of reliance by offering evidence that the alleged misrepresentations did not impact Kirkland's stock price.

A threshold question for the Court is determining Plaintiff's theory of price impact. Plaintiffs can either plead a price-inflation theory—alleging that a misrepresentation inflated the stock price—or an inflation-maintenance theory—alleging that a misrepresentation maintained inflation already built into the stock price. *ATRS*, 77 F.4th at 80.  Here, it is undisputed that none of the three alleged misrepresentations caused a statistically significant increase in Kirkland's stock price, and Plaintiff offers arguments premised on an inflation-maintenance theory. (*See* ECF No. 88 at 23, 26; ECF No. 105 at 13-16.)  Furthermore, Plaintiff's expert submissions make clear that Plaintiff is proceeding with an inflation-maintenance theory. (*See* ECF No. 107-1.) Accordingly, the Court analyzes this case under an inflation-maintenance framework.

In an inflation-maintenance scenario, "the misrepresentation prevents preexisting inflation in a stock price from dissipating, but does not cause a price uptick.  Instead, the back-end price drop—what happens when the truth is finally disclosed—operates as an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price.  Simply put, the theory goes: back-end price drop equals front-end inflation." *ATRS*, 77 F.4th at 80.  As the Supreme Court recently observed, however, the "inference . . . that the back-end price drop equals front-end inflation . . . starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman*, 594 U.S. at 123.

Accordingly, courts must undertake a mismatch inquiry in price-maintenance cases to determine "whether there is a basis to infer that the back-end price equals front-end inflation." *ATRS*, 77 F.4th at 99 n.11.  This inquiry requires "a closer fit (even if not precise) between the

front- and back-end statements" than courts have required when analyzing the loss causation element of securities fraud.  *Id*.  "In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense."  *Goldman*, 594 U.S. at 122 (internal citation and quotation marks omitted).

One way, but the not the only way, there could be a mismatch is in situations "when the earlier misrepresentation is generic (*e.g.,* 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.,* 'our fourth quarter earnings did not meet expectations')."  *Id*. at 123.  "Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop."  *Id*.

The Second Circuit recently provided guidance on how courts should conduct "a searching price impact analysis" in the specific scenario where (1) "there is a considerable gap" in genericness between the earlier statement and the subsequent disclosure, (2) the corrective disclosure does not directly refer to the alleged misstatement, and (3) the plaintiff claims the earlier generic statement was misleading by omission.  *ATRS*, 77 F.4th at 102.  First, courts must determine how generic the alleged misrepresentations are and whether there is a gap in specificity between the corrective disclosures and the earlier statements.  *Id.* at 93.  Second, if there is a gap, courts must then "ask . . . whether a truthful—but equally generic—substitute for the alleged misrepresentation would have impacted the stock price."  *Id*. at 102 (citing *In re Vivendi, S.A. Sec. Litig*., 838 F.3d 223 (2d Cir. 2016)).  Because "the value of the back-end proxy, given the gap in specificity, will be diminished" in this scenario, "courts should consider other indirect evidence of price impact."  *Id*.  Based on this analysis, the court must ultimately

"find whether the defendants have demonstrated, by a preponderance of the evidence, that the alleged misstatements did not in fact impact the price of the stock." *Id*. at 103.

In its September 2021 Opinion and Order, the Court narrowed this case to three public remarks made by Makuch that allegedly misled investors about Kirkland's plans to acquire Detour, a Canadian gold mining company. *Kirkland*, 2021 WL 4482151 at *6 (ECF No. 36 at 14). These remarks comprise a January 25, 2019 statement and a February 21, 2019 statement regarding Kirkland's focus on organic growth (the "M&A Statements") (ECF No. 25 ("AC") ¶¶ 45, 53), as well as a January 14, 2019 statement describing the production levels and costs targets that Kirkland would apply in assessing a potential asset acquisition (the "Minimum Standards Statement") (*id*. ¶ 39). The "corrective disclosure" to the three alleged misstatements was Kirkland's announcement on November 25, 2019, of its acquisition of Detour. (*Id*. ¶ 68.) Applying the inflation-maintenance framework for analyzing price impact, the Court first addresses the M&A Statements before turning to the Minimum Standards Statement.

### 1. M&A Statements

Makuch made the first of the two M&A Statements at an institutional investor conference on January 25, 2019. In response to a question from an analyst about potential M&A activity in 2019 to leverage Kirkland's share price, Makuch said:

> Well, I think, first off, you look at our organic growth strategy and what we're doing, I mean, we're where we have the ability to grow by 275,000 ounces. Currently, we're just the size of some mid-tier juniors. There's a lot of companies talking about the noncore assets in those levels. But we have it internally, we don't have to pay for it and we could finance it. And then if I lead into [ ] what we think might be happening in 2023 onward, we still have some significant organic growth in the company.
>
> So, to do—to use our paper just to—for this to grow, we don't need to do that to grow. We have internal growth, and we're really financing our internal—we're growing the company through diamond drill bit, through development, and through lowering unit cost and improvements.

(AC ¶ 45.)  Makuch made the second M&A Statement in a February 21, 2019 earnings call.

Replying to an analyst's question about M&A, Makuch said:

> [G]oing forward, I mean, we still see some significant growth and we talk about
> going to million ounces this year . . .  So that's the number one driver of our
> growth instead of going out and trying to buy that kind of company.  We're going
> to continue to grow with the diamond drill bit.  We want to continue to grow with
> development of our own assets and organically, and then we're going to look
> seriously at how we give value back to our shareholders.

(*Id*. ¶ 53.)  The alleged "corrective disclosure" to these statements came in the form of

Kirkland's announcement on November 25, 2019 that it was acquiring Detour in an all-stock

deal valued at $3.68 billion.  Kirkland's share price declined 17% that day.  (*See id*. ¶¶ 6, 68.)

Applying the Second Circuit's recent guidance, the Court first addresses the "baseline

question: how generic are the alleged misrepresentations?"  *See ATRS*, 77 F.4th at 93.  Although

the M&A Statements may be more specific in character than the Supreme Court's prototype, *see*

*Goldman*, 594 U.S. at 123, or some of the more platitudinous statements at issue in *ATRS*, *see* 77

F.4th at 82, the Court nonetheless finds that the alleged misrepresentations are fairly broad and

generic statements about the company's growth strategy.  In the statements, Makuch broadly

discussed Kirkland's goals and focus, which prioritized organic growth over M&A activity:

"[T]hat's the number one driver of our growth instead of going out and trying to buy that kind of

company."  (AC ¶ 53.)  Looking out to 2023 and beyond, Makuch also forecast that "we still

have some significant organic growth in the company."  (*Id*. ¶ 45.)  Significantly, neither

statement specifically ruled out considering acquisitions in the future, and Makuch's statements

about Kirkland not needing M&A for growth did not go much beyond broad generalities.

Comparing the M&A Statements with the Detour acquisition announcement, the Court

finds a considerable gap in genericness between the earlier statements and the corrective

disclosure.  Makuch's broad statements about Kirkland's focus on internal growth are far more

generic than the announcement of a specific all-stock acquisition of a specific mine, with unique characteristics, nine months later, at a particular valuation.  The Court also finds that the other prerequisites to triggering the searching price analysis required by *ATRS* are satisfied: the Detour announcement did not directly refer to the M&A Statements, and Plaintiff is effectively claiming that the earlier statements were misleading by omission.  *See ATRS*, 77 F.4th at 102.

Accordingly, the Court proceeds with the next step of the analysis: asking "whether a truthful—but equally generic—substitute for the alleged misrepresentation would have impacted the stock price."  *Id*.  The Court finds that the record does not support Plaintiff's initially pleaded theory that Kirkland was actively negotiating with Detour at the time of the three alleged misstatements in January and February 2019.  Instead, the record evidence shows that although Kirkland conducted diligence of Detour in late 2018, discussions between Kirkland and Detour ended in 2018 and did not resume until the summer of 2019—months after the alleged misstatements.  (*See* ECF No. 89 at 12-13.)  Therefore, a truthful, but equally generic, substitute for the M&A Statements would be: "Although we are focused on delivering significant organic growth, we are also considering external growth through M&A."

Having reviewed and considered all the evidence and expert submissions, the Court concludes, by a preponderance of the evidence, that a truthful, but equally generic, substitute for the M&A Statements would not have impacted the stock price.  Perhaps the most probative evidence on this question comes from a June 2019 statement in which Kirkland announced that it had opened a "Deal Room" and invited potential acquisition candidates and partners to submit information through an online portal.  (*See* ECF No. 91-4 ¶¶ 53-54.)  The Deal Room announcement is even more specific about Kirkland's openness to M&A activity than the

Court's substitute statement, and it is undisputed that the June 2019 statement did not cause a statistically significant decline in Kirkland's share price.  (*See id.* ¶ 57; ECF No. 107-1 at ¶ 17.)

Evidence from contemporaneous analyst reports also supports the absence of price impact.  "[M]arket commentary can provide insight into the kind of the information investors would rely upon in making investment decisions."  *ATRS*, 77 F.4th at 104.  Accordingly, the Court considers analyst statements to help determine whether the market relied upon the M&A Statements to infer that Kirkland was not pursuing M&A.  The record shows that no analysts referenced or discussed either of the M&A Statements at all—let alone drew the inference that Kirkland was not considering acquisitions.  (ECF No. 91-4 ¶¶ 48, 52.)  In contrast, market commentary throughout the class period shows that multiple analysts reported on Kirkland's potential to pursue M&A, including noting specific factors that could drive the company toward acquisitions.  (*Id.* ¶ 96 & n.155.)

The report of the defense expert, James Griffin, provides further support for the conclusion that the M&A Statements did not have a price impact.  Drawing on his experience in the mining industry, Griffin observes that "[m]ining is a self-depleting business model."  (ECF No. 91-1 at ¶ 17(a).)  Simply put, "a mining company must replace the ore reserves it is extracting in order to simply maintain its production profile and future mine life."  (*Id.*)  And if a company wants to achieve long-growth growth, "it must also obtain control of incremental ore reserves through exploration and acquisitions."  (*Id.*)  Griffin states that organic growth and M&A are "complementary" strategies for mining companies, "and no single one can replace the other without hurting a company's growth potential."  (*Id.*)  On this basis, Griffin opines that "[a] statement by the CEO of a gold mining company that it would not consider M&A opportunities"—which is how Plaintiff interprets Makuch's statements—"would have signaled

17

to the market that the company was placing self-imposed restrictions on potential growth companies. Therefore, I would not expect such a statement to have had a positive price impact." (*Id*. ¶ 17(b).) Based on Griffin's extensive experience in mining and M&A, the Court credits Griffin's expert conclusions to the extent that he is opining on how market participants would have perceived and reacted to a statement that Kirkland was not considering M&A.

The defense's economics expert, Dr. Jennifer Marietta-Westberg, has also offered evidence supporting alternative explanations for the stock decline following the Detour announcement. The academic literature shows that negative stock price reactions are associated with stock-financed deals—like the Detour acquisition—because the market interprets the use of stock as a signal that the acquiring company's stock was overvalued. (ECF No. 91-4 ¶¶ 67-70.) Kirkland's shareholders also expressed concern that the Detour acquisition was a sign that Kirkland's flagship Fosterville mine was underperforming. (*Id*. ¶¶ 72-75.) Analysts also expressed concern that Kirkland, which focused on underground mines, lacked experience operating open-pit mines like Detour's. (*Id*. ¶ 77.) The Court acknowledges that Marietta-Westberg presented this analysis in her critique of the damages methodology offered by Plaintiff's expert and that she did not perform a quantitative analysis disaggregating the factors that caused the price decline. Accordingly, the Court credits Marietta-Westberg's analysis to the extent that it offers credible, but potential, alternative explanations for the price decline.

Plaintiff's economics expert, Dr. Steven Feinstein, has offered his own report as well as a rebuttal to Marietta-Westberg. (ECF No. 69-1; ECF No. 107-1.) In his report, Feinstein determines that Kirkland's shares traded in an efficient market throughout the class period (ECF No. 69-1 ¶¶ 17-20)—a conclusion that Defendants do not dispute. Feinstein also proposes a class-wide methodology for calculating the damages stemming from the alleged misstatements,

but the report itself does not calculate damages.  (*Id.* ¶¶ 154-165.)  Specifically on the question of price impact, Feinstein argues that Marietta-Westberg's finding that Kirkland's stock price did not experience a statistically significant decline after the June 2019 Deal Room announcement should be given no weight in the Court's analysis because non-significance is "not proof of no price impact."  (ECF No. 107-1 ¶ 17.)  Feinstein's contention fatally misunderstands the analytical framework for inflation-maintenance cases.  It is true that, under an inflation-maintenance theory, the alleged misrepresentations would not cause a statistically significant increase in share price.  Because there are no visible price movements, courts have to seek out indirect proxies for the alleged inflation.  That is why the Second Circuit has instructed courts, in cases like this one, to ask "whether an equally generic, truthful substitute would have *dissipated* inflation."  *ATRS*, 77 F.4th at 99 (emphasis added).  In this case, the June 2019 Deal Room announcement is serving as the closest real-world proxy for the generic, but truthful, substitute for the M&A Statements.  Under an inflation-maintenance theory, the June 2019 Deal Room announcement would have dissipated the artificial inflation built into the share price.  The undisputed finding that the June 2019 announcement was not followed by a statistically significant decline in share price is, therefore, probative of the absence of price impact.

More generally, Feinstein opines that "the alleged misrepresentations may have introduced artificial inflation into the stock price without moving the stock price when made." (ECF No. 107-1 ¶ 56.)  That is a modest conclusion as far as it goes, as it simply restates the theory of inflation maintenance.  Once again, it is precisely because inflation maintenance is not directly measurable that courts have to resort to indirect proxies to assess price impact.

Even more crucially, Feinstein's price impact analysis is undermined by his factual assumptions.  Feinstein opines: "Misrepresentations consistent with prior understandings and

expectations, and concealment of information consistent with those prior understandings and expectations[,] would generally not cause the stock price to move when made, but will cause inflation nonetheless by propping up the price of the stock." (*Id*. ¶ 51.) He further opines that "nonsignificant movement on the alleged misrepresentation dates is reasonably congruent with investors' prior understanding and expectations about Kirkland." (*Id*. ¶ 53.) Feinstein's confusion arises when he bases his understanding of Kirkland investors' prior expectations on the assumption that the factual allegations contained in the Complaint are completely true (*see id*. ¶¶ 66-71)—even those allegations that have subsequently been disproven. For example, Feinstein expressly relies upon Plaintiff's allegation that Kirkland "was actively considering acquiring Detour at the time of Makuch's statements" (*id*. ¶ 56), even though, as discussed above, the allegation of contemporaneous falsity is now contradicted by the record and has effectively been abandoned by Plaintiff. Feinstein cites the Court's September 2021 Opinion and Order for the proposition that "the Court determined that Plaintiff sufficiently pled that investors were misled by the Company's alleged misrepresentations and omissions" (*id*. ¶ 67)—without recognizing that the Court had to assume the truth of the allegations at the motion-to-dismiss stage. In effect, Feinstein's opinion on price impact is akin to this statement: "The available evidence is consistent with an inflation-maintenance theory, assuming Plaintiff's factual allegations are true, even those that may have disproven by the record." The Court, therefore, affords Feinstein's price impact opinion the modest credit that it is due.

Based on the weight of evidence and expert submissions, the Court finds that a truthful, but equally generic, substitute for the M&A Statements would not have impacted Kirkland's share price. Accordingly, Defendants have demonstrated, by a preponderance of the evidence,

20

that the two M&A Statements did not actually affect or impact the share price.  Defendants have therefore rebutted the *Basic* presumption of reliance.

### 2. Minimum Standards Statement

Makuch made the Minimum Standards Statement in a January 14, 2019 meeting with analysts and investors:

> [S]o we're never going to [ ] not look if somebody has some noncore assets for sale.  But you've got to recognize why are they for sale, and we have—we've set some standards in terms of Kirkland Lake Gold.  Minimum production levels has to be over 100,000 ounces, it has to be meaningful level.  I might even say more than 100,000 ounces but it's got to be meaningful level of production.  Talk about cas[h] cost of $650 an ounce or under you can get from that asset; and all-in sustaining cost of $950 an ounce or under.  I mentioned that those two numbers are important because you can't let the cash cost get too high because you have to have money available to invest in new equipment, to invest in infrastructure, to invest in exploration—in sustainable exploration to maintain the business.  So, that's important to us.  And we need to see that.  As we need to stay at $950 because we have to have a minimum return and minimum risk on the company and if we talk about a 15% hurdle rate, then we're kind of good to $1.050 gold.

(AC ¶ 39.)  As with the M&A Statements, the "corrective disclosure" was Kirkland's November 2019 announcement of the Detour acquisition.

Once again, the Court begins its analysis by assessing the genericness of the alleged misstatement.  Compared with the two M&A Statements and the Supreme Court and Second Circuit prototypes, the Minimum Standards Statements is quite specific.  In this statement, Makuch announced specific numerical targets for production levels and costs for potential acquisition targets.  Because the specificity of the Minimum Standards Statement allows for a more direct, apples-to-apples comparison with the corrective disclosure, the Court determines that the "truthful, but equally generic" inquiry is unnecessary and inappropriate for this statement.  But that does not end the analysis, as a gap in specificity is not the only way there could be a mismatch between the two statements.  Under Second Circuit precedent, the Court

must still undertake an inquiry comparing the two statements to determine "whether there is a basis to infer that the back-end price equals front-end inflation." *ATRS*, 77 F.4th at 99 n.11.

Based on a review of the record evidence, the Court determines that there is a substantive mismatch between the Minimum Standards Statement and the Detour acquisition announcement. The Court's analysis turns on a resolution of the parties' competing interpretations of the Minimum Standards Statement. Plaintiff contends that the statement announces specific performance targets—specifically, a cash cost of $650 per ounce or lower, an all-in sustaining cost of $950 per ounce or lower, and quarterly production of 100,000 ounces—for a mine *at the time of acquisition*. (*See* AC ¶¶ 39-40.) Defendants, meanwhile, interpret the performance targets as future metrics applying *over the life of the mine*. (ECF No. 88 at 12-13.) It is undisputed that Detour's all-in sustaining cost exceeded the minimum standard of $950 an ounce at the time of the acquisition, but it is also undisputed that Detour met all three performance metrics by the third quarter of 2021. (*See* ECF No. 91-4 ¶ 38.) The weight of the evidence supports Defendants' interpretation. In an earlier earnings call on October 31, 2018, Makuch discussed the same performance metrics for potential acquisitions:

> [O]ur goal . . . in terms of objective of what is a Kirkland lake asset, first off, it has to be a mine that has significant production . . . it needs to be a large production similar to what we may be getting annually currently at Macassa and/or Fosterville. And you have to see cash costs below $650 an ounce and all-in sustaining costs below $950 an ounce *over the life of [the] mine[.]*

(*Id*. ¶ 37) (emphasis added). In response to a follow-up question on the same call, Makuch repeated the cost metrics: "[M]aybe in a nutshell, I'd probably say—if I say $650 an ounce cash cost [and] $950 all-in sustaining [cost], it gives you a sense at a minimum of what we want to look for." (*Id*.) Defendants have also adduced evidence of other Kirkland statements from the class period that strongly suggest that the same three performance metrics were long-term goals

for acquisition targets. (*Id*. ¶ 37 n. 49.) This future-oriented interpretation is consistent with Makuch's words in the M&A Statement that the cost metrics are what he would want to "get from that asset." (AC ¶ 39.) As the Minimum Standards Statement referred to future targets, rather than rigid requirements at the time of acquisition, there is a mismatch in content between the statement and the corrective disclosure under Plaintiff's inflation-maintenance theory. Because of this substantive mismatch, the "inference . . . that the back-end price drop equals front-end inflation . . . starts to break down," *Goldman*, 594 U.S. at 123, and the court must examine all probative evidence in assessing price impact, *see id*. at 122.

As with the M&A Statements, evidence from market commentary during the relevant period supports the absence of price impact. Three analysts who covered the January 14, 2019 investor day referred to the Minimum Standards Statement, but none of them indicated that it factored into their valuation of Kirkland's stock. (ECF No. 91-4 ¶ 42.) Furthermore, no analyst who covered the Detour acquisition referred back to the Minimum Standards Statements to state that Detour's failure to meet those targets resulted in the decline in share price. (*Id*.) Although analysts at the time did comment that Detour had higher costs than Kirkland, "commentary touching upon only the same subject matter . . . cannot be enough." *ATRS*, 77 F.4th at 74.

Griffin's expert report also supports the conclusion that the M&A Statement did not impact the share price. Griffin opines that if markets had understood the M&A Statement as setting "certain minimum standards that must be met for Kirkland to consider a potential acquisition, . . . [he] would not have expected a positive impact on Kirkland's stock price." (ECF No. 91-1 ¶ 17(c).) Griffin arrives at this conclusion because "[a] statement by the CEO of a gold mining company that the company would only target already high-performing mines would have signaled that Kirkland was limiting itself from pursing value-enhancing deals." (*Id*.)

As with his opinions on the M&A Statements, the Court credits Griffin's conclusion to the extent he is opining based on his understanding of how markets would have reacted to such a statement. Meanwhile, for the reasons discussed in relation to the M&A Statements, the Court finds Feinstein's expert opinions to be of little probative value on the subject of price impact.

Based on the substantive mismatch between the alleged misrepresentation and the corrective disclosure, as well as the weight of the other probative evidence, the Court finds, by a preponderance of the evidence, that Defendants have "sever[ed] the link between back-end price drop and front-end misrepresentation." *ATRS*, 77 F.4th at 104. Accordingly, Defendants have successfully rebutted the *Basic* presumption of reliance on the M&A Statement.

Because Defendants have rebutted the *Basic* presumption of reliance on all three statements, Plaintiff has not adequately demonstrated predominance, as required by Rule 23(b)(3). Class certification is therefore denied.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion to exclude the testimony and report of defense expert James Griffin is DENIED, and Plaintiff's amended motion for class certification is DENIED.

The Clerk of Court is directed to close the motions at ECF Nos. 76 and 108.

SO ORDERED.

Dated: March 29, 2024
New York, New York

_____
J. PAUL OETKEN
United States District Judge