UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| IN RE: KIRKLAND LAKE GOLD LTD. SECURITIES LITIGATION | 20-CV-4953 (JPO) OPINION AND ORDER |
|---|---|

J. PAUL OETKEN, District Judge:

Plaintiff Stephen Brahms brings this suit against remaining Defendants Kirkland Lake Gold Ltd. ("Kirkland"), a Canadian company that mined and processed gold, and Kirkland's former CEO, Anthony Makuch, for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, promulgated pursuant to the Exchange Act, 17 C.F.R. § 240.10b-5.

Before the Court is Brahms's motion to exclude the testimony and report of Defendants' proposed expert, George Ireland, and Defendants' motion for summary judgment under Federal Rule of Civil Procedure 56. For the reasons that follow, Brahms's motion to exclude is denied and Defendants' motion for summary judgment is granted.

**I.   Background**

   **A.   Factual Background**

The following facts are drawn from Defendants' Rule 56.1 Statement (ECF No. 163 ("Defs.' SOMF")), Brahms's Rule 56.1 Statement (ECF No. 177 ("Brahms's SOMF")), and Brahms's Amended Complaint (ECF No. 25 ("AC")). These facts are undisputed unless otherwise noted, and, for the purpose of resolving the motion for summary judgment, they are construed in the light most favorable to Brahms as the non-moving party.[1] *See Friend v.*

---

[1] Many of Brahms's direct responses to Defendants' 56.1 Statement "improperly interject[] arguments and/or immaterial facts in response to factual assertions made by Defendants and supported by the record, without specifically controverting those assertions."

1

*Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

Kirkland was a gold mining and exploration company that, prior to February 2022, owned and operated gold mines in Canada and Australia. (Defs.' SOMF ¶¶ 1-3.) Stephen Brahms was an investor in Kirkland who bought twenty shares of the company on September 6, 2019, and sold his shares on March 9, 2020. (*Id.* ¶¶ 10-11.) Brahms alleges that he lost $139 during the period between January 8, 2019, and November 25, 2019 (the "Class Period"). (*Id.* ¶ 12; AC ¶ 1.)

Kirkland "focuse[d] on the acquisition, development, and exploration of gold mining properties." (AC ¶ 20.) Before the events relevant to this action, Kirkland operated four mines in Canada and one mine in Australia, all of which "were obtained via acquisitions." (Defs.' SOMF ¶¶ 43-44.) According to the *National Post*, two of these mines, which ultimately were responsible for Kirkland's success in the sector, "had been marginal producers before being acquired by Kirkland Lake," and neither "looked like obvious winners to the rest of the sector" before Kirkland's acquisition. (*Id.* ¶ 49.)

### 1. Kirkland's Interest and Acquisition of Detour

In 2018, Kirkland looked into several potential acquisitions to add to its portfolio. (*Id.* ¶ 77.) During Kirkland's October 2018 Board meeting, the Board discussed seven different "potential strategic transactions" Kirkland could make, including acquiring Detour Gold Corporation (*id.*), a company that operated a gold mine in Ontario (*id.* ¶ 4). The following month, Kirkland signed a confidential agreement with Detour to "gain access to confidential

---

*Johnson v. City of New York*, No. 15-CV-6915, 2019 WL 294796, at *10 n.8 (S.D.N.Y. Jan. 23, 2019). Where Brahms's responses interject such arguments and disputes, the Court has reviewed the record to determine where a genuine issue of material fact may actually exist.

data," which would be necessary in evaluating Detour's prospects as a potential acquisition. (*Id.* ¶ 78.) This agreement "had an initial term of eighteen (18) months." (Brahms's SOMF ¶ 409.) Detour then gave several Kirkland employees access to its 2018 "data room," a portal that provided confidential data. (*See* Defs.' SOMF ¶¶ 78-79.) Kirkland employees downloaded documents from Detour's data room in November 2018 (Brahms's SOMF ¶¶ 429-30), and one employee used the data to prepare a report about Detour's specifications and prospects (*id.* ¶¶ 431-33). Ilhan Bahar, Detour's financial advisor at the time, attested that, during this initial review period, "Kirkland asked very few diligence questions concerning Detour, and . . . Kirkland's level of engagement and exhibited interest was low." (ECF No. 161 ¶ 9.) The last time a Kirkland employee accessed the 2018 data room was on December 18, 2018. (Defs.' SOMF ¶ 94.) During this same two-month period, Detour was actively sharing its data room with companies other than Kirkland. (*Id.* ¶ 97.) Ultimately, acquisition of Detour "was not included in any corporate development presentation made by Kirkland management to Kirkland's Board between November 1, 2018 and July 28, 2019." (*Id.* ¶ 112.)

Much changed at Detour during that time. Shareholders engaged in a months-long "proxy battle," which resulted in the company's Board "being substantially reconstituted." (*Id.* ¶ 99.) And in May 2019, a new CEO was appointed. (*Id.* ¶ 160.) The new CEO focused Detour on an updated production and efficiency plan for its Detour Lake Mine, and told analysts that Detour was planning to "optimize [its] operating performance and maximize the value of the asset," and set an "aspirational goal to reduce Detour's [all-in sustaining costs] to below US[ ]$900/oz." (ECF No. 160 ¶ 4-8.)

Meanwhile, Kirkland announced in June 2019 that it was working with a technology company to launch the "KL Gold Deal Room," an online platform that would enable Kirkland to

more systematically "identify[] and evaluat[e] potential investment opportunities." (Defs.' SOMF ¶ 59(a).) In its press release announcing the new initiative, Kirkland stated that while the company was "investing aggressively to continue to grow" its current mines, it was "also looking to grow shareholder value by investing in new, high-quality gold projects that, with the benefit of our capital and expertise, have the potential to become world-class mining operations." (*Id.*)

In July 2019, at the conclusion of Detour's proxy battle, Bahar reached out to Kirkland to connect Makuch and Detour's CEO to discuss interest in a possible acquisition. (*Id.* ¶¶ 99, 123, 160.) Following this connection, the possibility of a Detour acquisition was again presented to Kirkland's Board as one of thirteen "'candidates' for potential external growth." (*Id.* ¶ 127.) Makuch first met with Detour's CEO in August (*id.* ¶¶ 116(h), 128), and in early October Kirkland worked with its bank to put forward a "non-binding offer to Detour," subject to a "due diligence review." (*Id.* ¶¶ 145-46.) Detour confirmed by email that it wanted to "proceed . . . quickly" with the acquisition process, and it granted Kirkland access to its 2019 data room to conduct a review. (*See id.* ¶ 147.) In late October, "Kirkland conducted a site visit of the Detour Lake mine" and Detour did the same for one of Kirkland's mines. (*Id.* ¶ 148.)

The Kirkland Board was presented with the proposal for an acquisition of Detour at its November 6, 2019 meeting and decided to move forward with the transaction. (*Id.* ¶ 149.) On November 25, 2019, after conducting further due diligence, Kirkland announced publicly that it was acquiring Detour. (*Id.* ¶¶ 154-55, 157.) After this announcement, Kirkland's shares declined by 18.85%, as calculated using "a logarithmic return basis." (Brahms's SOMF ¶ 536.)

On January 28, 2020, Kirkland conducted a shareholder vote on the Detour acquisition. (Defs.' SOMF ¶ 159.) Approximately 98.99% of the shares voting at that meeting (74.05% of the issued and outstanding shares) voted to approve the acquisition. (*Id.*)

2.  **Statements at Issue**

In its September 2021 Opinion and Order, the Court granted Defendants' motion to dismiss on all claims except those based on three specific statements made by Makuch. (ECF No. 36 ("MTD Op.") at 14.) Brahms maintains that these statements were misleading because (1) they emphasize Kirkland's organic growth rather than mergers and acquisitions ("M&A") and (2) Makuch's specifications about minimum production standards were inaccurate. (ECF No. 179 ("Opp.") at 19-25.)

On January 14, 2019, during an "investor day" meeting, then-CEO Makuch spoke about the company's current status and future plans. (AC ¶ 38.) The following statement is at issue here:

> But anyway, so we're never going to be not look if somebody has some non-core assets for sale. But you've got to recognize why are they for sale, and we have—we've set some standards in terms of Kirkland Lake Gold. Minimum production levels has to be over 100,000 ounces, it has to be meaningful level. might even say more than 100,000 ounces but it's got to be meaningful level of production. Talk about cash cost of $650 an ounce or under you can get from that asset; and all-in sustaining cost of $950 an ounce or under. I mentioned that those two numbers are important because you can't let the cash costs get too high because you have to have money available to invest in new equipment, to invest in infrastructure, to invest in exploration—in sustainable exploration to maintain the business. So, that's important to us. And we need to see that. And we need to stay at $950 because we have to have a minimum return and minimum risk on the company and if we talk about a 15% hurdle rate, then we're kind of good to $1,050 gold. $1,050 maybe a little bit higher, $1,075 gold, but that's where we can at least have a company that's generating returns and anything above that is better.

(ECF No. 178 ¶ 24.)

On January 25, 2019, Makuch spoke at the CBC Whistler Institutional Conference. (AC ¶ 44.) In response to an analyst's question "regarding potential M&A activity in 2019," Makuch said:

> Well, I think, first off, you look at our organic growth strategy and what we're doing, I mean, we're—we have the ability to grow by 275,000 ounces. Currently, we're just the size of some mid-tier juniors. There's a lot of companies talking

>about the noncore assets in those levels.  But we have it internally, we don't have to pay for it and we could finance it.  And then if I lead into [] what we think might be happening in 2023 onward, we still have some significant organic growth in the company.
>
>So, to do—to use our paper just to—for this to grow, we don't need to do that to grow. We have internal growth, and we're really financing our internal—we're growing the company through the diamond drill bit, through development, and through lowering unit cost and improvements.

(AC ¶ 45; Defs.' SOMF ¶ 35.)

And on February 22, 2019, Makuch said on Kirkland's public call with investors to discuss fourth quarter earnings:

>I think the—the way we look forward to get value for our shareholders, we continue to generate value with the drill bit.  And so we're going to want to continue to do that. We talked about potentially increasing our exploration efforts and trying to grow there. . . . But the other aspect, I mean, yes, there's been a lot of talk about M&A, and there's M&A activity happening in our industry.  And we've prospered from it in the past, but going forward, I mean, we still see some significant growth. And we talk about going to 1 million ounces this year, but when we talk about—but we also point out about what we're doing at Holloway, what we're doing in the Northern Territory, further growth at Macassa with the shaft, and further potential growth at Fosterville and everywhere else when we fill our mills.  There's still at least another half a million plus of growth, per ounce per year growth in the company.  So that's the number one driver of our growth instead of going out and trying to buy that kind of a company.  We want to continue to grow with the diamond drill bit.  We want to continue to grow with development of our own assets and organically.

(AC ¶ 53; Defs.' SOMF ¶ 37.)

### B. Procedural History

The Court assumes familiarity with the procedural history of this case, as set forth in the Court's 2021 Opinion and Order on Defendants' motion to dismiss, *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20-CV-4953, 2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021) (ECF No. 36), and the Court's 2024 Opinion and Order denying class certification, *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20-CV-4953, 2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) (ECF No. 211).

Relevant here, Defendants moved for summary judgment on December 5, 2023.  (ECF

6

No. 153.)  Brahms opposed the motion on February 7, 2024 (Opp.), and Defendants replied in support of their motion on March 25, 2024 (ECF No. 206).

Brahms moved to exclude the expert testimony of George Ireland on February 7, 2024. (ECF No. 173.)  Defendants opposed the motion on March 6, 2024 (ECF No. 199), and Brahms replied in further support of his motion to exclude on March 25, 2024 (ECF No. 203).

On July 15, 2024, the Court stayed the case pending Brahms's interlocutory appeal of this Court's denial of class certification to the Second Circuit.  (ECF No. 217.)  On September 13, 2024, the Second Circuit, expressing concern about a "judicial standoff, or gastonette," ordered Brahms's Rule 23(f) petition held in abeyance pending resolution of Defendants' summary judgment motion.  *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 24-CV-1030, 2024 WL 4275757, at *1 (2d Cir. Sept. 12, 2024).  This Court lifted the stay on October 10, 2024 (ECF No. 220), and now resolves the pending motions.

## II.     Legal Standard

A court must grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is only appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In making this determination, a court "must resolve all ambiguities and draw all inferences in favor [of] the nonmoving party."  *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 515 (2d Cir. 2023).

In moving for summary judgment, "[t]he moving party bears the burden of establishing

the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). If the moving party satisfies its initial burden, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). But the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts[;]" rather, it "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (quotation marks omitted). Further, "[t]he mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-movant." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (cleaned up) (quoting *Anderson*, 477 U.S. at 252).

### III. Discussion

Brahms's remaining claims are against Kirkland and Makuch for violations of Section 10(b) of the Exchange Act and Rule 10b-5 and against Makuch for violations of Section 20(a) of the Act. These claims arise from the three statements enumerated above, which Brahms alleges materially mislead investors in two ways: stating that (1) Kirkland was focused on growing "organically" when it was actually pursuing an acquisition of Detour, and (2) Kirkland would only acquire gold mines with certain minimum production standards when it acquired Detour which did not immediately meet those specifications. (Opp. at 19-25.)

Defendants move for summary judgment on all claims, arguing that there is no evidence of any material misrepresentation or the requisite scienter, and that there is an insufficient link between the alleged fraud and the $139 loss Brahms suffered. (ECF No. 155 ("Mem.") at 23, 32,

37.)  The Court agrees and grants Defendants' motion in full.[2]

### A. Section 10(b) and Rule 10b-5

A claim under Section 10(b) and "its implementing regulation, Rule 10b-5," must include "(1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 351-52 (2d Cir. 2022).  Defendants argue no reasonable trier of fact could find that there was material misrepresentation, scienter, or loss causation.  The Court first addresses misrepresentation and then turns to scienter.[3]

#### 1. Material Misrepresentation

Defendants contend that Makuch's statements about organic/internal growth and minimum production standards did not misstate or omit material facts about Kirkland's M&A plans.  (Mem. at 23.)  "[Section] 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (cleaned up).  Even so, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (quotation marks omitted).

---

[2] Brahms has also moved to exclude the proffered testimony of one of Defendants' experts, George Ireland.  (ECF No. 173.)  Because the Court holds that Brahms's claims fail as a matter of law without considering Ireland's testimony, the Court need not and does not address that motion, which is denied as moot.

[3] Because every one of these elements is necessary for a claim under Section 10(b) and Rule 10b-5, Defendants need only establish the absence of a genuine issue of material fact on a single element.  While the Court reaches both the material misrepresentation and scienter elements because the two analyses are interrelated here, the Court does not need to and thus declines to reach the element of loss causation.

#### a. M&A Statements

Makuch's statements about "organic" and "internal" growth were not misleading both because they did not exclude the possibility that Kirkland would engage in M&A if the right opportunity arose, and because it is beyond genuine dispute that Kirkland was not actively considering the acquisition of Detour when Makuch made the statements. In short, Kirkland was "tell[ing] the whole truth" about its stance on M&A and its plans to acquire Detour.[4] *Cf. id.*

#### i. Organic Growth

Makuch's January 25 answer to an analyst's question about Kirkland's "M&A Activity" included references to "organic growth" and "internal growth." (AC ¶ 45; Defs.' SOMF ¶ 35.) Makuch also told the analyst: "[We] have [the ability to grow] internally, we don't have to pay for it." *Id.* And on February 22, Makuch said to another analyst: "So [growth at our current mines is] the number one driver of our growth instead of going out and trying to buy that kind of a company. We want to continue to grow with the diamond drill bit. We want to continue to grow with development of our own assets and organically." (AC ¶ 53; Defs.' SOMF ¶ 37.)

Brahms maintains that these statements were misleading because they focused on the message of "growing organically" and did not divulge "the truth about [Kirkland's] acquisition strategy." (Opp. at 19.) But, as the Court noted in its September 2021 Opinion and Order, these

---

[4] The Court's September 2021 Opinion and Order on Defendant's motion to dismiss permitted Brahms's claims of misrepresentation to proceed based on these three statements made in January and February of 2019. (MTD Op. at 14.) However, because the Court had to accept everything Brahms alleged as true in that procedural posture, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Court's holding was based on the allegation that "Makuch's statements were during active acquisition negotiations between Kirkland and Detour." (*Id.* at 6.) Now, "[w]ith the benefit of over twelve thousand documents and ten depositions" (Mem. at 24), the Court has reviewed the evidence identified by Defendants that clearly indicates that there were not ongoing acquisition negotiations between Kirkland and Detour in January and February of 2019. Brahms, meanwhile, has failed to identify any evidence in the record to suggest otherwise, thus failing his burden at this stage. *See Salahuddin*, 467 F.3d at 273.

statements did not explicitly preclude Kirkland from engaging in M&A, or "acquiring a company like Detour." (MTD Op. at 5.) While organic growth using the diamond drill bit might have been Kirkland's "number one" priority, that does not mean M&A was not on the table as an alternative form of growth. Further, the statements identified by Brahms were not Kirkland's only communication with the public and its shareholders about M&A possibilities during this two-month period. In his statement on January 14, 2019—the first of the three that Brahms challenges here—Makuch told shareholders that "we're never going to [] not look if somebody has some non-core assets for sale." (ECF No. 178 ¶ 24.) And on February 21, 2019, just a day before the second statement at issue here, Kirkland published its annual report which included the following statements under its "Risks and Uncertainties" Section:

> Given that mines have limited lives based on proven and probable mineral reserves, the Company must continually replace and expand its mineral resources and mineral reserves at its gold mines and discover, develop, or **acquire mineral reserves for production**. The Company's ability to maintain or increase its annual production of gold will depend in significant part on its ability to **bring new mines into production** and to expand mineral reserves or extend the life of existing mines. . . .
>
> To extend the lives of its mines and projects, ensure the continued operation of the business and realize its growth strategy, **it is essential that the Company continues to** . . . **undertake successful exploration or acquire new mineral resources**. . . .
>
> **From time to time, the Company examines opportunities to acquire additional mining assets and businesses**. Any acquisition that the Company may choose to complete may be of a significant size, may change the scale of the Company's business and operations, and **may expose the Company to new geographic, political, operating, financial and geological risks**. The Company's success in its acquisition activities depends on its ability to identify suitable acquisition candidates, negotiate acceptable terms for any such acquisition, and integrate the acquired operations successfully with those of the Company. **Any acquisitions would be accompanied by risks**.

(Defs.' SOMF ¶¶ 57-58 (emphasis added).)

In short, neither of Makuch's statements at issue here held Kirkland to only one route to

11

revenue growth. Though his comments imply that organic growth would be Kirkland's primary focus during this time, he at no point absolutely ruled out the possibility of M&A activity to further grow the company's assets.

Further, Brahms's own arguments in this case tend to undermine his claim that Kirkland committed itself to pursuing only organic growth. It turns reason on its head to argue simultaneously that Kirkland promised investors that (1) it would not acquire new mines and (2) it would only acquire mines with minimum production standards. By asserting his second argument, Brahms has to concede that Kirkland was also discussing the possibility of M&A activity during the Class Period.

Ultimately, then, a rational trier of fact could not review this record and find that Kirkland materially misled investors with its statements about organic growth even as it considered M&A as an alternate avenue for growth.

### ii. Omission of Detour

Nor did Makuch mislead investors by omitting a reference to a possible Detour acquisition in his January and February 2019 comments. For an omission to be misleading under Section 10(b) and its corresponding regulation, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (quotation marks omitted) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "When a corporation . . . announces [a specific business] goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993).

Brahms argues that Kirkland was considering the acquisition of Detour from November

2018, when the two first entered into a confidentiality agreement and Detour shared its 2018 data room with several Kirkland employees, until the acquisition was made public in November 2019. (Opp. at 6-7.)  It is true that Kirkland, like several other companies, took initial steps to examine Detour in November 2018.  (ECF No. 161 ¶ 9; Defs.' SOMF ¶ 97.)  However, at that time, Kirkland "asked very few diligence questions concerning Detour, and . . . Kirkland's level of engagement and exhibited interest was low."[5]  (ECF No. 161 ¶ 9; Defs.' SOMF ¶ 97.)  And the last time a Kirkland employee examined Detour's 2018 data room was on December 18, 2018.[6]  (Defs.' SOMF ¶ 94.)  Importantly, the record contains no evidence that there was any contact between Kirkland and Detour from January 2019 to mid-July 2019 or that Kirkland was "active[ly]" or "serious[ly]" considering the acquisition in January and February 2019, when Makuch made the comments at issue.[7]  *Cf. In re Time Warner*, 9 F.3d at 268.

---

[5] Brahms relies heavily on the fact that Kirkland and Detour signed a confidentiality agreement in November 2018 in order for Detour to share its data room, and that agreement lasted eighteen months and was not terminated early. (Brahms's SOMF ¶¶ 408, 438).  Brahms also points to the fact that Kirkland employees "did not destroy" the documents they downloaded from Detour's 2018 data room.  (*Id.* ¶¶ 445-47.)  However, the confidentiality agreement itself stated:  "Nothing in this Agreement creates or is intended to create any (including under common law) partnership, joint venture relationship, fiduciary relationship or relationship of confidence and trust between the Parties."  (ECF No. 90-14 at 8.)  Further, twelve other companies expressed interest in Detour in 2018, and at least seven of them accessed Detour's data room in 2018, so that relationship alone cannot be evidence of an impending acquisition.  (Defs.' SOMF ¶¶ 101-02.)  And the failure to terminate the confidentiality agreement or destroy documents, passive occurrences, do not show any active consideration on behalf of Kirkland.

[6] Though Makuch could have disclosed in his January and February 2019 comments that Kirkland had engaged with Detour's data the previous calendar year, there is not a "substantial likelihood" that disclosing such information "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Cf. Hutchison*, 647 F.3d at 485 (quotation marks omitted).  By January 2019, Kirkland was not actively considering acquiring Detour, and thus giving investors information about an exploratory agreement that did not evolve further would not have "significantly altered" the information Makuch shared.  *See also In re Time Warner Inc.*, 9 F.3d at 267 ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.").

[7] Brahms argues:  "No witnesses who were deposed and asked about communications between Kirkland and Detour [from January 2019 to June 2019] could confirm that

13

Fast forward to July 2019, when Detour's financial advisor reached out to Kirkland to gauge interest in a possible acquisition. (Defs.' SOMF ¶¶ 123, 160.) Kirkland's Board was presented with the possible Detour acquisition in late July, when Detour was listed as one of thirteen "'candidates' for potential external growth." (*Id.* ¶ 127.) And in August, Makuch met Detour's new CEO for the first time to discuss the possible acquisition. (*Id.* ¶ 116(h), 128.)

Kirkland identifies several reasons why its interest in Detour was reignited in July 2019 and not in the six-month period prior. The month before, Kirkland had announced its "KL Gold Deal Room," which enabled it to better "identify[] and evaluat[e] potential investment opportunities." (Defs.' SOMF ¶ 59(a).) And, importantly, Detour's corporate makeup changed dramatically from late 2018 to the summer of 2019. Shareholders waged a "proxy battle" that resulted in the Detour Board of Directors "being substantially reconstituted." (*Id.* ¶ 60.) And in May 2019, Detour's Board appointed a new CEO who outlined new and aggressive growth goals for their mine. (*See* ECF No. 160 ¶ 4-8.) But no matter the reason, what is relevant here is that the record shows that Kirkland reengaged with Detour in late July of 2019, five months after Makuch made the latest comment at issue in this case.

With the aid of discovery, the Court now determines that no rational trier of fact could find that Makuch's January and February 2019 comments about Kirkland's M&A strategy were misleading. Makuch's comments did not preclude the possibility of M&A as a secondary

---

communications between Kirkland and Detour ceased in January 2019." (ECF No. 178 ¶ 110.) But the only evidence Brahms cites for this contention is the deposition transcript of Kirkland's Senior Vice President for Corporate Development at that time, Darin Smith, stating that it was his "recollection" that the first time he spoke with Detour was in July 2019 and that "I don't believe there were any direct conversations [between Kirkland and Detour] prior to July 2019." (ECF No. 164-15 at 244:8-2:45:17.) Brahms has identified no evidence affirmatively suggesting that there was continued communication between the companies during the first half of 2019 or that Kirkland was actively or seriously considering an acquisition of Detour in January or February of 2019, thus failing to meet his burden at this stage.

approach after internal growth. And Kirkland was not actively nor seriously considering a Detour acquisition bid when Makuch made these comments, so there was no omission that would trigger fault under the Exchange Act.

### b. Minimum Standards Statement

Nor was Makuch's January 14, 2019 statement about minimum standards for possible acquisitions misleading. Makuch, in speaking about possible M&A activity in the future, stated that Kirkland had "set some standards" for its gold production, including production levels "over 100,000 ounces," a "cash cost of $650 an ounce or under," and an "all-in sustaining cost of $950 an ounce or under." (AC ¶ 39; ECF No. 178 ¶ 24.) Makuch did not clarify at that time whether that standard would be measured at the initial purchase of a new mine or after Kirkland's acquisition and over the entire life of the mine. However, given other public comments Makuch had made about this same standard, and Kirkland's history of acquiring declining mines and turning them into low-cost, high-volume producers, no rational trier of fact could find Makuch's comments here to be materially misleading.

In determining whether a statement is materially misleading, "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (quotation marks omitted). Context is important because a plaintiff "may not cherry pick certain public statements for its complaint and divorce them from the universe of disclosed information." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 171 (2d Cir. 2021).

Context here shows that Makuch's January 2019 statement about Kirkland's minimum standards was not misleading, because Kirkland's management had clarified in comments to

investors before and afterwards that such standards were measured after Kirkland had acquired mines, not before Kirkland had purchased the mine.

>In late October 2018, Makuch told investors during Kirkland's Q3 Earnings Call:
>
>And our goal, I mean we've been—in terms of objective of what is a Kirkland Lake asset, first off, it has to be a mine that has significant production. And we think it's—from account scale perspective, it definitely—it needs to be a large production similar to what we may be getting annually currently at Macassa and/or Fosterville. **And you have to see cash costs below $650 an ounce and all-in sustaining costs below $950 an ounce over the life of mine**, so—as a minimum.

(Defs.' SOMF ¶ 65 (emphasis added).)

>On Kirkland's January 17, 2019 investor day, just three days after the comment at issue, Makuch told investors:
>
>You should never turn away from anything because **you don't know if there's hidden value there**, right. So we're always—and we have the capabilities to look, and we're not—some of these areas you're talking about, we have a lot of knowledge and understanding of what **the potential there and maybe what potential we could be, but we also—we may be able to bring to the table**, I should say.

(*Id.* ¶ 63(a) (emphasis added).)

>And on Kirkland's February 22, 2019 call to discuss fourth quarter earnings in 2018 (the same call during which Makuch made the second M&A statement at issue in this case), Kirkland's Vice President of Australian Operations stated:
>
>Yes, I guess there's 2 criteria for us, really. One's that we want to see an operation of significant scale. And for us, we're looking at a minimum 100,000 ounce per annum production profile. But we also want to see attractive cost metrics, so cash costs of $650.00 U.S. or lower, all-in sustaining costs of $950.00 U.S. or lower. **We don't expect it to be immediately at those sort of numbers, but we want to see a clear pipeline to that**.

(ECF No. 164-24 at 13-14 (emphasis added); Defs.' SOMF ¶ 65(c).) These statements, focusing on future value and production potential years out, all emphasize a mine's possible output once Kirkland has acquired it and implemented its diamond drill bit technology.

16

Further, Kirkland's success had come originally from its well-known practice of buying up low performing mines and turning them around. (Defs.' SOMF ¶ 49.) Makuch underscored this history in his May 7, 2019 comments to shareholders:

> Then when you talk about from an acquisition point of view, if you look at Kirkland Lake Gold where it is today compared to what it was in 2016, **I mean the company got here through some acquisitions, some timely acquisitions with—first aspect with St Andrews and then with Fosterville and looking to find value that maybe other people missed or that it was there. And part of what I learned from Eric, right, he said you want a steal value, you want to find it early. So we're always going to be looking for that—the steal value**. . . . So we need to be disciplined. We need to find ways that we can add value effectively. And if that's with a drill bit or with a strategic acquisition in the right way, we can do that. And using our cash sometimes to take value and earn value that way, we can. But we're not just going to go out there and buy something for the sake of buying.

(*Id.* ¶ 63(b).)

Kirkland's history of buying low-yield mines and turning them into high performers was publicly noted. A *National Post* article wrote in October 2019:

> [Kirkland's] success can be summed up by its turnaround of two underground mines, Fosterville and Macassa, which have consistently produced record amounts of gold. Neither the company nor Makuch discovered either mine, **both of which had been marginal producers before being acquired by Kirkland Lake**. . . . Neither Fosterville nor Macassa looked like obvious winners to the rest of the sector.

(*Id.* ¶ 49 (emphasis added).)

Investors would thus understand that, given Kirkland's acquisition history and its practice of "stealing" value where others missed it, the minimum standards Makuch mentioned on January 14 would apply to a mine's production capabilities after Kirkland began to implement its mining practices at the new site.

Ultimately, the Detour mine met the minimum standards within a year and a half of Kirkland's operation. In the first quarter, Detour's cash costs were $573 per ounce, which was below the $650 minimum standard. (*Id.* ¶ 239(a).) And by the sixth quarter, Detour's all-in

17

sustaining cost dropped to $937, which was below the $950 minimum. (*Id.* ¶ 239(c).) Kirkland's 2021 estimates for the "life of the mine" production costs were even lower, and far surpassed the 100,000 ounces of minimum production. (*Id.* ¶¶ 240 (c)-(e).) *See Shemian v. Rsch. In Motion Ltd.*, No. 11-CV-4068, 2013 WL 1285779, at *22 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014) (summary order) ("[T]he fact that a majority of [Defendants' financial] predictions were correct easily defeats that claim [of misrepresentation].")

Given the context of Makuch's other comments to investors about how Kirkland evaluates a prospective acquisition, Kirkland's history of acquiring turn-around mines, and Detour's production output within a short period of time after the acquisition, no rational trier of fact could find Makuch's statement on January 14, 2019 to be materially misleading.

  **2.**  **Scienter**

Scienter under Section 10(b) and Rule 10b–5(b) can be established either by a showing "that defendants had the motive and opportunity to commit fraud," or with "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). The Second Circuit has outlined a balancing test for scienter when "no motive or opportunity (other than a generalized business motive) is shown." *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355. In such a case, "the circumstantial evidence of conscious misbehavior must be correspondingly greater and show highly unreasonable behavior or that which evinces an extreme departure from the standards of ordinary care." *Id.* (cleaned up).

Given the lack of a genuine dispute as to the evidence that there were no on-going discussions between Detour and Kirkland when Makuch's three statements were made, and that

the minimum standards statements did not refer to a mine's production capacity at the time of purchase, Brahms's allegations of scienter also fail. Brahms has produced no evidence for a rational trier of fact to find that Makuch had a motive or opportunity to commit fraud; and nothing produced in discovery tended to show conscious misbehavior or recklessness.

Brahms argues that Makuch was, at "absolute minimum," reckless in making comments about organic growth and minimum standards. (Opp. at 26-27.) But Makuch used language, as analyzed above, that qualified his statements about organic growth and did not preclude the possibility that Kirkland would continue to engage in M&A as a secondary focus. *See supra* Section III.A.1.a.i. And though it would have been more accurate for Makuch to clarify that his January 14, 2019 comments about minimum production standards were intended as a future goal for acquired mines, such a one-time omission is hardly "highly unreasonable behavior" or "an extreme departure from the standards of ordinary care." *Cf. Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355. After all, Makuch made similar comments to investors before and afterwards that clarified that Kirkland's standards were projections for once Kirkland acquired and better utilized a turn-around mine. *See supra* Section III.A.1.b.

Because Brahms points to no evidence in the record that supports his claims of conscious misbehavior or recklessness, a rational trier of fact could not find the requisite scienter here. Thus, no triable issues remain as to misrepresentation or scienter, and Defendants' motion for summary judgment is granted on Brahms's Section 10(b) and Rule 10b-5 claims.

**B.     Section 20(a)**

Section 20(a) of the Exchange Act provides an avenue to hold liable individuals who "control" the entities found to be at fault under the Act. 15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the

19

controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108.

Here, the Court has determined that no rational trier of fact could find a violation of Section 10(b) or Rule 10-b5. *Supra* Section IIIA. Because there is no "primary violation" of the Exchange Act by Kirkland, Brahms's claim fails the first element of a Section 20(a) analysis. *See Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 356-57 (holding the same); *ATSI Commc'ns*, 493 F.3d at 108 (same). Defendants' motion is thus granted for Brahms's remaining Section 20(a) claim.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion to exclude the testimony and report of defense expert George Ireland is DENIED as moot, and Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the motion at Docket Numbers 153 and 173, enter judgment of dismissal, and close this case.

SO ORDERED.

Dated: December 13, 2024
       New York, New York

_____
J. PAUL OETKEN
United States District Judge